UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

          Plaintiff,

                                    Case No. 24-cr-69-pp

    v.

TIMOTHY J. HAWTHORNE,

          Defendant.

**ORDER ADOPTING JUDGE JOSEPH'S RECOMMENDATION (DKT. NO. 46), DENYING DEFENDANT'S MOTIONS TO SUPPRESS (DKT. NOS. 22, 23) AND REQUIRING PARTIES TO FILE A STATUS REPORT**

On April 9, 2024, the grand jury returned a three-count indictment charging the defendant with possession with intent to distribute methamphetamine and fentanyl in violation of 21 U.S.C. §841(b)(1)(A), possessing a firearm in connection with a drug trafficking offense under 18 U.S.C. §924(c) and possessing a machine gun under 18 U.S.C. §922(o). Dkt. No. 1. On April 4, 2025, the defendant filed a motion to suppress the warrantless search of his apartment on the ground that officers unlawfully entered the apartment, engaged in coercive tactics to obtain written consent from the mother of his children and exceeded the scope of the allegedly coerced consent. Dkt. No. 22. The defendant suggested that an evidentiary hearing might be necessary should the government contest any of the facts presented in the motion. Id. at 19. The defendant also moved to suppress the evidence obtained as the result of the "unlawfully prolonged traffic stop," and asked for

1

an evidentiary hearing on whether the officer could smell marijuana in the vehicle. Dkt. No. 23 at 5.

Magistrate Judge Nancy Joseph granted the defendant's request for an evidentiary hearing on the issues of whether the defendant had standing to challenge the alleged unlawful entry to a residence on Custer Avenue, dkt. no. 34, and whether the officers had the ability to smell marijuana in car the defendant was driving, dkt. no. 37 at 3. She conducted the hearing on June 2, 2025, dkt. no. 38, and after further briefing, recommended that this court deny both motions to suppress, dkt. no. 46. The defendant filed an unopposed motion for an extension of time to file objections to Judge Josephs' report and recommendation, dkt. no. 47; this court granted the motion, dkt. no. 48, and the defendant filed his objection on September 19, 2025, dkt. no. 49. The government sought additional time to respond, dkt. no. 51; the court granted that request, dkt. no. 52, and the government filed its response on October 17, 2025, dkt. no. 53. The defense requested an extension of time to file a reply, dkt. no. 56; again, the court granted the request, extending the deadline to November 3, 2025, dkt. no. 57. The defendant filed his reply on November 4, dkt. no. 58, along with a motion for leave to file *instanter*, dkt. no. 59. The court granted that motion. Dkt. No. 60.

Having reviewed the transcript of the evidentiary hearing and the parties' submissions, the court will overrule the defendant's objections, adopt Judge Joseph's recommendation and deny the defendant's motions to suppress.

## I.    Legal Standard

In a criminal case, district judges may designate magistrate judges to submit to the district court judge proposed findings of fact and recommendations for disposition of a "dispositive" motion, such as a motion to dismiss an indictment. 28 U.S.C. §636(b)(1)(B). When a magistrate judge submits to the district judge proposed findings and recommendations under § 636(b)(1)(B), the parties have fourteen days to object to the magistrate judge's report and recommendation. 28 U.S.C. §636(b)(1)(C). If a party objects, the district judge must make a *de novo* determination of the portions of the report and recommendation to which the party objects. 28 U.S.C. §636(b)(1)(C). The district judge "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge;" the district judge also has the options of asking for further evidence or remanding the issue to the magistrate judge with instructions for further proceedings. Id.

## II.    Facts

Both parties rely on the body-worn camera footage, exhibits and the testimony from the evidentiary hearing. The parties did not contest the recitation of the facts Judge Joseph included in her recommendation, so this court has incorporated those findings in this order:

1. Traffic Stop

On July 10, 2023, at approximately 3:30 p.m., MPD officers conducted a traffic stop of a white 2021 Dodge Challenger for a purported window tint violation. (Docket # 22 at 2; Tr. 8.) Footage from Officer Kotnik's body-worn camera shows Kotnik approach the driver's side of the vehicle. (Ex. A, 00:54–56.) The window is almost fully down and the driver is sticking his hands out of the window.

3

(*Id.*) Kotnik asks the driver to lower the passenger side window as well for his partner, Officer Brandon Rutherford, who approaches on the passenger side. (*Id.*) Kotnik introduces himself and asks the driver his name, to which he responds "Tim." (*Id.* at 00:58–1:06.) The driver is later identified as defendant Timothy Hawthorne. Kotnik asks Hawthorne for his driver's license and Hawthorne complies. (*Id.* at 1:04–1:19.)

While reaching for his license, Kotnik states that the reason Hawthorne was stopped was for the window tint. (*Id.* at 1:09–1:12.) When Hawthorne questions how Kotnik was able to see the window tint, Kotnik responds that he is one of the few trained in window tint in the department. (*Id.* at 1:12–1:21.) Kotnik then asks Hawthorne whether he knows the window's tint level, to which Hawthorne responds that he can still see out of the window. (*Id.* at 1:22–1:26.) Kotnik again asks Hawthorne whether he knows the tint level, and Hawthorne responds that he does not know. (*Id.* at 1:27–1:34.)

Kotnik asks whether Hawthorne owns the vehicle, and Hawthorne responds that the car belongs to his cousin. (*Id.* at 1:34–1:46.) Kotnik then asks whether Hawthorne is aware of the legal tint limit, to which he responds that he does not know. (*Id.* at 1:58–2:09.) While Hawthorne searches through his phone for information regarding the vehicle (such as the VIN number and insurance tying the vehicle to Hawthorne's cousin), Kotnik takes out a flashlight and briefly shines it into the vehicle. (*Id.* at 2:12–2:29.) After Hawthorne shows Kotnik the insurance card, Kotnik asks Hawthorne whether he has a CCW permit and whether he has any weapons in the vehicle. (*Id.* at 2:39–2:46.) Hawthorne answers "no" to both questions. (*Id.*)

Kotnik then asks Hawthorne "when's the last time you smoked weed in the car?," to which Hawthorne responds, "I don't smoke weed." (*Id.* at 2:49–2:53.) Kotnik testified that he asked Hawthorne this question because he could smell the odor of fresh marijuana in the vehicle. (Tr. 9.) Kotnik next asks Hawthorne what the Ozium spray is for, to which Hawthorne responds for "his black right here." (Ex. A at 2:54–2:58.) Kotnik testified that "black" usually refers to a tobacco cigar. (Tr. 38.) He testified that Ozium spray is a vehicle deoderizer and in his experience, individuals who have marijuana in their vehicles sometimes use this spray to mask the smell of marijuana. (Tr. 10.) Kotnik further testified, however, that in his experience, the smell of cigars can be strong and if Hawthorne was smoking a cigar in the vehicle, that would be a competing smell. (Tr. 38.)

4

While Kotnik is speaking to Hawthorne, Kotnik's partner, Officer Rutherford, is looking through the windows on the vehicle's passenger side with a flashlight. (Ex. B, 1:21–2:50.) He is soon joined by another officer, who also looks through the rear passenger side window. (*Id.* at 2:50.) Immediately after asking Hawthorne about the Ozium spray, Rutherford then moves to the driver's side and begins peering into the back of the vehicle through the back driver's side window. (Ex. A at 3:02–3:11.) On Rutherford's body camera he can be heard telling Kotnik that he does not see anything and then asks Kotnik whether he was going to test the windows. (Ex. B at 3:08.) Kotnik responds that he would go and retrieve his tint meter. (Ex. A at 3:02–3:11.)

Rutherford asks Hawthorne whether he had a "good" driver's license, to which Hawthorne responds that it is. (Ex. B at 3:12–3:18.) After Kotnik leaves to get his tint meter, Hawthorne asks Rutherford "what happened, though, what's up," to which Rutherford responds, "Didn't he just explain why we stopped you today?" (*Id.* at 3:18–3:27.) Hawthorne states that he said it was because of the tint, and Hawthorne and Rutherford discuss the tint for a few seconds. (*Id.* at 3:27–3:48.) After Kotnik returns to the vehicle, Rutherford asks Hawthorne to step out of the vehicle, stating that his license is suspended so he is not supposed to be driving. (*Id.* at 4:02–4:17.) Rutherford again asks Hawthorne to "slide out" of the vehicle, to which Hawthorne responds, "for what?" stating that he did not do anything. (*Id.* at 4:13–4:17.) Rutherford states that he just told Hawthorne why, and reaches in through the driver's side window to unlock the door. (*Id.* at 4:13–4:18.)

Hawthorne then places his foot on the accelerator, revving the engine, but the car was not in drive so it did not move. (Ex. A. at 8:25–8:30.) The officers pull Hawthorne out of the vehicle, yelling to watch for a gun, and subsequently tase him. (Ex. B at 4:19–4:50.) Hawthorne is handcuffed, searched, and placed into custody, and the officers call for medical assistance. (*Id.* at 4:50–6:50.) The officers subsequently search Hawthorne's vehicle and find bullets and magazines in the center console and a firearm under the driver's seat. (Ex. A at 7:02–8:02.) While searching the vehicle, Kotnik asks another officer whether there was weed in the vehicle. (Evid. Hearing Ex. 2 at 8:23–8:25.) Kotnik testified that he asked this question because he could smell marijuana coming from inside the vehicle. (Tr. 12.) Approximately one minute later, Kotnik can be heard on Officer Miguel Benitez's body camera footage asking whether there

was weed in the car noting that it smells like weed and stating that Hawthorne had Ozium spray. (Evid. Hearing Ex. 2 at 9:18–9:32.)

Kotnik testified that approximately 3.8 grams of marijuana was recovered from the center console of Hawthorne's vehicle, an amount that can fit in the palm of one's hand. (Tr. 30, 50.) The marijuana was packaged in a mylar bag, which Kotnik described as a plastic zipstyle or sealable-style plastic packaging, with material thicker than that of a sandwich bag. (Tr. 31.) Kotnik testified that he has smelled the odor of fresh marijuana in vehicles before, an odor which he described as smelling like a strong citrus or pine. (Tr. 36, 39.)

At approximately 3:40 p.m., Kotnik can be heard on his body camera reporting that he tested the window tint, and the tint of both windows was at 16 percent. (Ex. A at 9:40–10:29.) Kotnik testified that the window tint was excessive and Hawthorne was issued a ticket for the window tint violation. (Tr. 66.)

2. Search of Residence

While Hawthorne was still on scene sitting in a police vehicle, officers asked him about releasing the vehicle to his girlfriend, Melissa Pettis. (Tr. 14, Evid. Hearing Ex. 3.) Hawthorne was asked where Pettis lived, to which he responded that she lived "down the street" on 27th Street and Custer Avenue, but he did not know the specific address or apartment number because Pettis had recently moved there. (*Id.* at 1:16–1:28.) The next day, on July 11, 2023, Hawthorne was interviewed at the Police Administration Building in Milwaukee and was asked how long he and Pettis have lived in the Custer Avenue apartment. (Tr. 15, Evid. Hearing Ex. 9 at 14:26–14:30.) Hawthorne responded that while Pettis, who is his children's mother, lives there and has lived there for a few years, he does not live there but rather sleeps over "from time to time." (*Id.* at 14:30–14:48.) When Hawthorne is asked where he lives, he states that he is homeless. (Id. at 14:48–14:53.)

Pettis, however, testified that she and Hawthorne lived together in the Custer Avenue apartment with their young daughter in July 2023. (Tr. 70.) At that time, Pettis was eight months pregnant with their second daughter. (*Id.*) Pettis testified that although she and Hawthorne were not in a romantic relationship at that time, they were cohabitating in order to co-parent their daughters. (*Id.*) Pettis states that Hawthorne lived at the apartment "full time" and spent most of his nights there, except for the occasional Friday or Saturday night where he would stay out late and return in the

6

morning. (Tr. 71.) Pettis testified that on the night prior to Hawthorne's July 10, 2023 arrest, Hawthorne slept at the Custer Avenue apartment. (Tr. 72.)

Pettis states that she and Hawthorne moved into the Custer Avenue apartment together in 2019 and he continues to live there at present. (Tr. 68–69.) While Pettis' name is on the lease, Hawthorne's name is on the electric bill and the two split the rent. (*Id.*) Pettis testified that Hawthorne has his own set of keys for the apartment, which he has had since they moved into the apartment in 2019. (Tr. 73.) Hawthorne does not need Pettis' permission to enter the apartment and keeps his belonging there, including his clothes, toothbrush, towel, shoes, and documents. (*Id.*)

On July 10, 2023, at approximately 4:05 p.m., several officers arrived at the Custer Avenue apartment to speak to Pettis. (Ex. D at 00:41.) The building has an outside door with the number "2650" on it that opens into a hallway with several doors leading into several different apartment units. (*Id.* at 00:55–00:57.) Pettis approaches the outside door as an officer waves and calls "Melissa." (Id. at 00:47–00:49.) Another officer opens the outside door as Pettis peers outside at the officers. (*Id.* at 00:54.) The officers then enter the common hallway and tell Pettis that they are trying to do an interview with a woman named "Melissa" in Unit 4. (*Id.* at 00:56.) Pettis confirms that she is the Melissa living in Unit 4. (*Id.* at 00:59.) Pettis, who is visibly pregnant and wearing pajamas, states that she is going to put on a robe and walks into her apartment, leaving the door ajar behind her. (*Id.* at 1:03–1:08.) The officers immediately push open the door and walk into the apartment. (*Id.* at 1:08–1:20.)

The apartment is dark; Pettis explains to the officers after she returns from putting on a robe that she and her daughter had been sleeping. (*Id.* at 1:32.) While Pettis is in her bedroom getting dressed, the officers use flashlights to look around the apartment. (*Id.* at 1:17–1:32.) The officers ask Pettis if she could turn on the lights, and she complies. (*Id.* at 1:34–1:36.) Officer Evan Domine proceeds to speak with Pettis about Hawthorne, explaining that Hawthorne was arrested during a traffic stop for possessing a gun without a CCW permit. (*Id.* at 1:48–2:19.) While Domine speaks with Pettis, the other officers wander around the rooms in the front of the apartment, including looking behind a curtain in the living room. (*Id.* at 1:50–2:36.) Officer Ndiva Malafa is heard on his body camera footage speaking to another officer on the radio and then is asked by an officer standing outside whether they had walked through the

7

apartment, to which Malafa states that "we're about to." (*Id.* at 3:30–3:40.)

Malafa re-enters the apartment as Domine explains to Pettis they have a "few options," including her consenting to officers searching the apartment, which will take 15 minutes, or the officers asking a judge to sign a search warrant to search the apartment, which will take hours. (*Id.* at 3:52–4:14.) Domine states that it is "totally up to you." (*Id.* at 4:20.) Pettis responds that it did not really matter to her, but that she would wait for the search warrant. (*Id.* at 4:27–4:43.) Domine then asks whether Pettis has some fear, to which she responds, "not at all." (*Id.* at 4:43–4:46). Domine then asks Pettis what her "hang up" was and she responds that "It just happened all so fast." (*Id.* at 4:48–4:50).

Another officer proceeds to tell Pettis that getting a search warrant would be a long process, and Pettis asks whether she and her daughter can go outside. (*Id.* at 4:51–5:10.) Domine tells Pettis that she can grab her daughter and go outside and Pettis begins walking down the hall to her bedroom so she can put on pants. (*Id.* at 5:13–5:21.) Domine states that someone will need to go with her and motions for a female officer on scene to accompany Pettis. (*Id.* at 5:21–5:26.) Domine asks whether there is anyone else in the bedroom, to which she responds it is only her and her daughter. (Id. at 5:26.) The female officer asks whether she can look in the back room "real fast" to make sure no one else was in the apartment, to which Pettis responds, "Sure." (*Id.* at 5:26–5:34.) Malafa is then heard stating on the radio that they are doing a walk-through. (*Id.* at 5:38.)

An officer opens a hallway closet and then the officers enter the back room and check the closet for potential persons hiding. (Id. at 6:02–6:19.) After leaving the back room, the officer opens another hall closet and finds firearms. (*Id.* at 6:35–7:05.) Malafa then proceeds to speak to Pettis about consenting to search the apartment. (*Id.* at 7:24.) He asks what her apprehension is with consenting and whether she wanted him to break down the process for her, to which she responds, "I mean, sure." *(Id.* at 7:24–7:39.) He states that while it is her constitutional right to deny the search, he explains that a search warrant is "very intrusive" and they would have to go through everything, including her young daughter's things. (*Id.* at 8:30–8:58.) Malafa explains that consenting would make the search more expeditious and while it is her decision, he wanted her to be aware of what the process entails. (*Id.* at 8:58–9:08.) He then asks Pettis whether she wanted to at least "go over

the form," noting that she could still say no, to which she responds, "Yeah, I guess." (*Id.* at 10:30–10:44.)

Malafa then returns with the consent form and explains it to Pettis. (Ex. E, 0:47–2:35.) Pettis asks whether this is the "first option" the officers were talking about, which Malafa confirms, reminding that the second option is going and writing up a search warrant, which could "take a little bit." (*Id.* at 2:25–2:35.) Pettis states that they could just "go ahead and do this one," referring to the consent form, noting that there was nothing to find, to her knowledge. (*Id.* at 2:35–2:47.)

Dkt. No. 46 at 2-9.

The parties continue to disagree about whether Officer Kotnik could smell the marijuana in the defendant's vehicle through the open window and whether the defendant had a sufficient connection to the apartment to give him standing to challenge the entry into that apartment.

### III. Defendant's Motions to Suppress

On April 4, 2025, the defendant filed two motions to suppress.

A. <u>Defendant's Motion to Suppress Based on the Entry and Search of the Apartment</u> (Dkt. No. 22)

In the first motion, the defendant argued that the officers entered his apartment without a warrant, without valid consent and without exigent circumstances. Dkt. No. 22. He accused officers of pressuring his former girlfriend, Melissa Pettis, who was pregnant and alone with her toddler, to consent to a search of the apartment. <u>Id.</u> at 1. The defendant said that the body-worn camera footage confirmed that the police did not have verbal consent to enter the apartment and that Pettis did not imply consent. <u>Id.</u> at 12. The defendant said that at the time of entry, officers already had arrested him and had no reason to believe that any confederate lived at the apartment. <u>Id.</u>

9

He argued that any purported consent was tainted by the unlawful entry, was coerced and was limited in scope (which he argued the officers exceeded). Id. at 13. The defendant pointed out that officers sought Pettis's consent less than four minutes after arrival, id. at 14, they remained in the home after she initially refused the search, id., and a male officer walked into her bedroom— where her toddler was sleeping and while she was getting dressed—without warning, id. at 15-17. The defendant argued that even if Pettis gave consent, the officers said they were only interested in the gun boxes, paperwork and any other guns. Id. at 18. According to the defendant, a white plastic grocery bag containing pills, which was located in one of the closets in the apartment, does not "fit the bill." Id. The defendant asked for an evidentiary hearing because there were factual disputes about whether his license was suspended at the time of the stop and whether the officers had any prior knowledge about the apartment. Id. at 19.

B. <u>Motion to Suppress Evidence Based on Traffic Stop</u> (Dkt. No. 23)

In the second motion, the defendant moved to suppress "all evidence obtained as a result of the unlawfully prolonged traffic stop." Dkt. No. 23 at 5. He asserted that "[t]he officers' unrelated questioning, lacking any independent, lawfully developed suspicion, unlawfully prolonged the stop and tainted everything that followed." Id. at 6.

The defendant explained that he was not challenging the initial July 10, 2023 stop based on the excessive tint of the vehicle's windows. Id. at 3. He said that he was challenging "the extension of that stop beyond that original scope."

10

Id. The defendant argued that although the officers pulled him over for illegal window tint, "they quickly turned to other investigative purposes." Id. The defendant said that Kotnik asked whether the defendant had his CCW card, when he last smoked weed in the car, and why he had Ozium spray. Id. at 4. The defendant suggested that the officers couldn't smell marijuana because the only marijuana in the car was contained in a small, sealed, airtight mylar bag tucked in the closed center console. Id. The defendant asked for an evidentiary hearing on whether the officer could smell the odor of marijuana from the car. Id. at 5.

The government opposed the request for an evidentiary hearing as to the prolonged stop, asserting that none of the factual disputes were material. Dkt. No. 24 at 2. The government explained that officers brought the tint meter to the car, that they instructed the defendant to get out of the car and that the defendant had attempted to flee. Id. It recounted that the officers had arrested the defendant and searched his car, recovering a gun. Id.

Judge Joseph denied the request for the evidentiary hearing with respect to the prolonged traffic stop, reasoning that the defendant had done nothing more than question the facts presented. Dkt. No. 25 at 4. Judge Joseph pointed out that the defendant did not make definite, detailed allegations regarding the facts in dispute and that he offered little more than a desire to cross-examine the witness. Id. But she granted the request for an evidentiary hearing on the motion to suppress the unlawful entry into the apartment because the government argued that the defendant did not have a reasonable

11

expectation of privacy in the apartment and therefore lacked standing to challenge the search. Dkt. No. 34.

The defendant renewed his request for an evidentiary hearing as to whether the officers plausibly could smell the odor of fresh marijuana emanating from the vehicle. Dkt. No. 33. In his second request, the defendant attached studies showing that someone could not reliably detect five pounds of marijuana packaged in a garbage bag. Id. The defendant reasoned that it would have been impossible for the officer to smell three grams of marijuana contained in an airtight, mylar bag in the center console. Id. at 2. Judge Joseph said that it was a "close call" as to whether the studies on the marijuana were sufficient to warrant an evidentiary hearing. Dkt. No. 37 at 3. But because she already had scheduled an evidentiary hearing on the issue of standing to challenge the entry into the apartment, and in the interest of deciding the motion on a fully developed record, Judge Joseph granted the request for an evidentiary hearing with respect to the traffic stop on the narrow issue of the officers' ability to smell the marijuana. Id.

C.    Evidentiary Hearing

At the June 2, 2025 evidentiary hearing, the government called Kotnik to testify. Dkt. No. 40. Kotnik testified about his training and experience in detecting the smell of marijuana, and about what he smelled and observed when he stopped the defendant on July 10, 2023. Id. at 5-13. The government also played the body-worn camera footage showing that the defendant could

not provide a street address for Pettis, id. at 14, and that he told officers he was homeless, id. at 16.

On cross-examination, Kotnik admitted that the odor of marijuana can be a common basis for stopping vehicles, id. at 23, that Domine had not referenced the marijuana in his report, id. at 25, that he (Kotnik) had had a two-day training course in identifying the smell of controlled substances, id. at 28, and that smaller quantities of marijuana can be more difficult to discern, id. at 29. Kotnik testified that a mylar bag is stronger than a Dollar Store sandwich bag, id. at 33, and that he did not know whether the baggy found in the vehicle had been torn open, id. at 34. Kotnik also explained that he smelled fresh rather than burnt marijuana. Id. at 37. He testified that based on his training and experience, there was marijuana in the vehicle. Id. at 41. He added that he had asked about the Ozium spray because he had seen it "hand-in-hand with possession of marijuana." Id. at 45.

During the government's redirect, Kotnik testified that he had pulled the defendant over for the window tint violation, that he had tested the window tint and that it was excessive and that he had written a ticket for the window tint. Id. at 66. He also testified that he smelled the marijuana when he asked the defendant about it. Id.

The defendant called Pettis, who testified that she had moved into the Custer Avenue apartment with the defendant in 2019. Id. at 68. She testified that although her name was on the lease, the defendant's name was on the electric bill. Id. at 69. She testified that she and the defendant were not

13

"together" but that they continued to cohabit for the sake of their daughters. Id. at 70. Pettis said that the defendant spent most of his nights at the Custer Avenue apartment, that he had his own set of keys and that he did not need permission to enter. Id. at 71, 73. Pettis said that the defendant kept clothes, a toothbrush, towels, shoes and other belongings in the apartment. Id. at 73. Pettis also testified that, when the car was returned to her after the officers left the apartment, she could not smell marijuana. Id. at 77-78.

D.    Post-Hearing Briefs

Following the hearing, Judge Joseph allowed another round of briefing. The defendant focused his argument on the small amount of marijuana found in the car, Kotnik's testimony that mylar pouches are thicker than sandwich bags and have resealable tops and the absence of any evidence that the bag had been opened. Dkt. No. 41 at 1-4. The defendant pointed to Kotnik's testimony that smaller amounts of marijuana are more difficult to detect by smell and suggested that the government should have produced some evidence that the small amount could have produced the strong smell of fresh marijuana. Id. at 5. The defendant emphasized that Domine's report did not reference the smell of marijuana, id. at 6-7, and that Domine had asked Benitez to "smoosh" to confirm the weed rather than opening the pouch, id. at 8. The defendant underscored Pettis's testimony that she could not detect the odor of marijuana when the car was returned to her later in the day. Id. at 9. The defendant asserted that the record was replete with evidence that cast serious doubt on Kotnik's testimony and argued that blind deference to the

officer's testimony would perpetuate the problem of officers "testilying." Id. at 9. As for the standing issue, the defendant argued that it was clear that he lived at the apartment, slept there most nights, had the authority to enter without Pettis's approval and kept belongings there. Id. at 11.

The government responded that the testimony and the record established that during the stop, the vehicle smelled like marijuana. Dkt. No. 42 at 1, 2. Aside from the excessive tint, Kotnik testified that—based on training and experience—he could smell the marijuana and therefore asked the defendant when he last smoked in the vehicle. Id. at 2. The government recounted that Kotnik had followed up with the question about the Ozium spray because, in Kotnik's experience, the spray sometimes was used to mask the smell of marijuana. Id. at 3. The government pointed to additional corroboration when, during the search, Kotnik asked whether the officers had located marijuana in the car and again mentioned the Ozium spray. Id. The government pointed out that there was no evidence that the pouch had been sealed, and that Rutherford also noted the smell of marijuana. Id. at 5, 6. With respect to Pettis's testimony, the government emphasized that the marijuana had been removed from the car when it was returned to her and that the search had been conducted with the doors open. Id. at 7. The government also emphasized that Pettis was the only one on the lease and that she did not produce a copy of the electric bill; it suggested that Pettis had an obvious bias because the defendant was the father of her two children. Id. at 9.

# IV. Judge Joseph's Report and Recommendation

A. <u>Motion to Suppress Evidence Based on Traffic Stop</u> (Dkt. No. 23)

In her August 22, 2025 report and recommendation, Judge Joseph began her analysis by emphasizing that the defendant did not challenge the initial basis for the July 10, 2023 traffic stop for the window tint violation. Dkt. No. 46 at 9. Citing <u>Rodriguez v. United States</u>, 575 U.S. 348, 354 (2015), Judge Joseph acknowledged that a stop may last no longer than is necessary to effectuate its purpose. Dkt. No. 46 at 10. She pointed out that <u>Rodriguez</u> holds that an officer may also conduct "certain unrelated checks during an otherwise lawful traffic stop" so long as the officer does not do so in a way that prolongs the stop "absent the reasonable suspicion normally demanded to justify detaining an individual." <u>Id.</u> Judge Joseph found <u>Rodriguez</u> to be instructive because the officer in that case had stopped a vehicle for a traffic violation but then had conducted a dog sniff of the vehicle after the driver was issued a warning ticket. <u>Id.</u> The United States Supreme Court ruled that the critical question is whether the dog sniff adds time to the stop, unless the detention is justified by individualized suspicion that would justify detaining the individual beyond completion of the stop. <u>Id.</u> at 11 (citing <u>Rodriguez</u>, 575 U.S. at 358).

Judge Joseph determined that the resolution of the defendant's motion to suppress turned on Kotnik's testimony, because the smell of marijuana emanating from a vehicle would give the officers probable cause to investigate further. <u>Id.</u> at 11. She found "Kotnik's testimony that he smelled the odor of fresh marijuana emanating from the vehicle credible." <u>Id.</u> at 12. She wrote:

16

Kotnik's testimony is bolstered by his body-worn camera footage. Specifically, approximately three minutes into the traffic stop, Kotnik can be heard asking Hawthorne when he last smoked weed in the car. (Tr. 10.) Kotnik continues to question him about why he had Ozium spray in the vehicle, which Kotnik testified in his experience is used to mask the smell of marijuana. (*Id.*) Further, approximately twenty minutes after Kotnik initially asks Hawthorne about his marijuana use, he asks the officers searching the car whether they found weed in the vehicle. (Tr. 12.) He testified that he asked that question because he had smelled marijuana coming from the vehicle. (*Id.*)

This is not a case where the first time Officer Kotnik mentions the smell of marijuana is at the evidentiary hearing almost two years after the incident; rather, he can be heard contemporaneously questioning both Hawthorne and other officers on scene about the presence of marijuana. This supports Kotnik's contention that he smelled marijuana while approaching Hawthorne's vehicle as opposed to Kotnik "testilying" to justify the search of the vehicle after the fact. (*See* Docket # 41 at 9–10.)

Dkt. No. 46 at 12.

Judge Joseph distinguished a decision cited by the defendant, United States v. Bradshaw, Case No. 24-cr-240, 2025 WL 14455876 (E.D. Wis. May 20, 2025); in that case, Judge Griesbach had found no evidence that anything in the vehicle could have produced the odor of raw marijuana that the officer smelled. Id. at 13. Judge Joseph rejected the defendant's argument that Bradshaw holds that "a single officer's testimony can never satisfy the government's burden of proof." Id. She explained that the defendant in this case had questioned a person's "ability to smell a small amount of packaged marijuana in the center console." Id. She explained that, unlike the facts in Bradshaw, the defendant in this case had not suggested that there was nothing in the vehicle that could have produced the scent. Id. Judge Joseph cited Kotnik's training regarding the smell of controlled substances, the smell of

fresh marijuana in the vehicle, the description of a "stronger citrus or pine smell," Kotnik's familiarity with the smell based on prior stops and his testimony that the smell of fresh marijuana can linger. Id. Judge Joseph ruled that Kotnik's ability to smell the marijuana did not unlawfully extend the stop beyond the investigation of the window tint because based on the odor of marijuana, the officers had reasonable suspicion—independent of the stop—to investigate the defendant for a drug offense. Id.

B.    Defendant's Motion to Suppress Based on the Search of the Apartment (Dkt. No. 22)

With respect to the motion to suppress based on the search of the apartment, Judge Joseph first determined that the defendant had standing to challenge the search of the apartment. Dkt. No. 46 at 15. She found credible Pettis's testimony that the defendant had lived with her in the Custer Avenue apartment from the day that she moved in until the time of Judge Joseph's decision. Id. Judge Joseph cited the fact that defendant knew that the apartment was located "down the street" on 27th and Custer Avenue. Id. She did not credit the defendant's assertions to the officers to the officers that he was homeless, because his young daughter was living at the apartment and Pettis was pregnant with their second child. Id. She pointed out that on entering the apartment, the officers saw two shooting targets and Pettis explained that one belonged to her and the other to the defendant. Id.

Judge Joseph also found that the government had met its burden of proving by a preponderance of the evidence that Pettis had freely and voluntarily consented to the search. Id. at 16-18. She relied on the officers'

18

interaction with Pettis, which was captured on the body-worn cameras. Id. Judge Joseph acknowledged that the situation was undoubtedly "unexpected and stressful" for Pettis but could not conclude that the consent was involuntary. Id. at 17. She recounted that Pettis had re-entered the apartment to put on a robe but had not closed the door behind her. Id. Citing United States v. Walls, 225 F.3d 858, 863 (7th Cir. 2000), Judge Joseph found that the act of opening the door and stepping back to allow entry can be sufficient to convey consent to enter. Id. She pointed out that Pettis had returned with the robe but had not asked the officers to leave or acted surprised that they were waiting for her in the apartment. Id.

Judge Joseph found the entire interaction to be friendly and not hostile. Id. She recounted that no voices were raised, that no firearms displayed and that Pettis was not in custody or physically coerced in any way. Id. She acknowledged that the officers presented consent as the most efficient and least intrusive option, id., but observed that the officers did present Pettis with options, id. at 18. Judge Joseph found that Pettis initially had said that she would wait but appeared "hesitant and unsure," and that the officers took that opportunity to change her mind. Id. Judge Joseph pointed out that the officers had asked Pettis if she wanted to look over the consent form and that she had responded with "I mean sure" and "Yeah I guess." Id. Judge Joseph found that Pettis had consented and signed the form and that it did not appear that her will "was overcome so as to render her consent involuntary." Id.

## V.    Objections

A.    <u>Defendant's Objections</u> (Dkt. No. 49)

The defendant filed objections to the rulings on both motions.

### 1.    *Traffic Stop*

With respect to the traffic stop, the defendant argues that the recommendation does not hold the government to its burden of proving that there was additional reasonable suspicion to justify prolonging the traffic stop beyond its original scope. Dkt. No. 49 at 2 (citing <u>Rodriguez</u>, 575 U.S. at 348). The defendant agrees with Judge Joseph that the legality of the stop depends on Kotnik's testimony. <u>Id.</u> at 3. But the defendant argues that in evaluating Kotnik's testimony, Judge Joseph gave insufficient weight to the undisputed facts that create "significant reason" to doubt what Kotnik had to say. <u>Id.</u> at 4. The defendant points to the following facts:

- Only 3.8 grams of marijuana were located in a mylar pouch in the center counsel. The defendant emphasizes that Kotnik testified that mylar pouches are "much thicker" than sandwich bags and have a resealable top that keeps the marijuana fresher by limiting exposure to air. <u>Id.</u> at 4.

- There was no evidence that the pouch had been opened. Kotnik testified that mylar pouches have a tear away top. <u>Id.</u> The pouch found in the defendant's car had the tear-away top intact. <u>Id.</u> The pouch contained 3.8 grams, which Kotnik testified typically comes in the packaging. <u>Id.</u> at 5. And Officer Domine asked Benitez to "smoosh" the bag to feel if it was marijuana—the defendant says they could have looked inside if it were open. <u>Id.</u>

- Kotnik admitted that larger quantities of marijuana smell stronger, and smaller quantities are more difficult to detect by odor. <u>Id.</u> The defendant points out that the government didn't independently establish that the small amount of

marijuana in the bag was sufficient to be detectable by smell outside the vehicle. Id. at 6.

- There is no evidence that Kotnik has any "real uniquely honed or specialized skill of olfaction." Id. His training in detecting controlled substances lasted two days and smells were "described" to him, but never actually shown by example. Id.

- Officer Domine, who was the primary investigator, did not include a reference to the smell of marijuana in his report. Id. at 7. Kotnik testified that if Domine had smelled the marijuana he would have included that fact in the report. Id.

- When Officer Malafa asked Domine if they had found a marijuana blunt, Domine said "no, they were pulling [the defendant] out because he didn't have a license." Id.

- Pettis testified that the car was returned to her the same day and that she did not smell marijuana in the car even though she is familiar with the smell and accurately described it. Id. at 8.

The defendant argues that the government should have to prove "more than the bare claim from Officer Kotnik that he smelled the odor to meet its burden of proof." Id. at 9. He contends that the real question is not whether the defendant lied but whether the government met its burden of proof. Id. (citing Bradshaw, 2025 WL 1445587 at *6). The defendant says that the fact that there is reason to doubt Kotnik's testimony, coupled with the fact that Domine did not include reference to the smell of marijuana in the report and that Pettis said she could not smell it in the returned car, meant that there were doubts. Id. at 10. The defendant argues that Judge Joseph shifted the burden to the defense to prove that Kotnik's claims were impossible. Id. He asserts that the body-worn camera footage is "weak" corroboration—that Kotnik didn't ask

21

whether the defendant had marijuana but rather "when is the last time you smoked weed in the car?" Id. The defendant argues that Kotnik was fishing for cause and thought that marijuana would be a good avenue because he spotted the Ozium spray in the vehicle. Id. at 11.

The defendant dismisses the second "contemporaneous mention of marijuana" because Kotnik asked officers during the search *if* they found marijuana. Id. at 12. The defendant suggests that Kotnik wanted to confirm that the officers had found marijuana before he claimed to have smelled it. Id. The defendant also asserts that Domine's statements are telling but, at the same time, admits that the statements are difficult to make out in the background over the rustling noise of Benitez searching the vehicle. Id. The defendant believes that Domine said something "along the lines of '. . . like, you're not going to get a whiff of it in the center console,'" which the defendant suggests may have been a warning to Kotnik that his claim of smelling weed would not be credible. Id. The defendant asserts that Kotnik responded with, "Well yeah, he had the ozone spray or whatever, too." Id. The defendant takes the position that there are too many reasons to doubt the government's evidence, which means that the government has not met its burden. Id. at 13.

       2.   *Warrantless Entry*

The defendant objects to the portion of the recommendation addressing the warrantless entry of the apartment for three reasons: (1) the search was unlawful because it was tainted by the officers' "blatantly unlawful entry;" (2)

Pettis's "eventual" consent was not voluntary; and (3) the search exceeded the scope of the consent. Id. at 13.

First, the defendant says that officers encountered Pettis—the defendant's pregnant girlfriend—in a long shirt with no bottoms and that she said, "Let me put on a robe or something" as she walked back into the apartment. Id. at 15. The defendant accuses Judge Joseph of mischaracterizing Pettis's retreat into the apartment as "leaving the door ajar," and points to the following facts:

- Pettis came to the door in a long pajama shirt with no bottoms and said, "Let me put on a robe or something" as she walked back into the apartment. Id. at 15.

- Pettis "slid" back into the apartment, being careful not to open the door further. Id

- She left the officers in the hallway with the door three-fourths closed. Id. at 15-16.

- One officer pushed the door open and the entire group of male officers walked into the home. Id.

The defendant argues that Judge Joseph's characterization was incorrect because none of Pettis's actions implied consent. Id.

The defendant next argues that there are insufficient facts from which the court could infer consent even if Pettis had opened the door. Id. The defendant cites United States v. Sabo, 724 F.3d 891 (7th Cir. 2013), for its holding that "one does not consent to the government entering his home by simply answering the door." Id. at 17. He emphasizes that Pettis took no

affirmative steps to suggest that she was inviting officers into her home. Id. at 18.

The defendant also takes issue with Judge Joseph's finding that Pettis did not ask officers to leave once she returned with a robe. Id. at 17. The defendant says that Judge Joseph conflated consent with acquiescence, which is impermissible under case law. Id. at 20 (citing United States v. Shaibu, 920 F.2d 1423, 1428 (9th Cir. 1990)). According to the defendant, Pettis's reaction may have been indicative of fear or a desire to avoid escalation or confrontation, rather than consent. Id. at 21. He argues that Judge Joseph's finding risks creating a two-tiered system of Fourth Amendment protections: "one for those who feel safe enough to resist police intrusion and a far weaker one for communities, like Black women, who have disproportionately bore [sic] the brunt of police violence." Id. at 21.

Finally, the defendant argues that Judge Joseph's recommendation did not address his argument that courts are more cautious about inferring intent when police have not made their intentions clear. Id. at 21 (citing Lopez-Rodriguez v. Mukasey, 536 F.3d 1012, 1017 (9th Cir. 2008)). The defendant relies on the Seventh Circuit's decision in Sparing v. Vill. of Olympia Fields, 266 F.3d 684 (7th Cir. 2001). Id. at 23. In that case, officers knocked on a door to make an arrest and the subject never opened the screen door. Id. When the subject said he wanted to put something down inside his home, the officer entered the home behind the subject by opening the closed screen door. Id. On that fact pattern, the Seventh Circuit found no evidence of consent. Id.

The defendant argues that this case is similar to <u>Sparing</u> because Pettis said she was going to put on a robe but never demonstrated consent for the officers to follow. The defendant further argues that Judge Joseph did not address the fact that the eventual consent was tainted by unlawful entry and that the scope of the search exceeded any consent—even if the consent was voluntary. <u>Id.</u> at 24.

      B.      <u>Government's Response</u>

          1.    *Traffic Stop*

The government responds by pointing out that the parties agree that the officers had reasonable suspicion to stop the defendant based on the excessive tint of the vehicle. Dkt. No. 53 at 8 (citing Dkt. No. 49 at 3). It also points to the fact that the defendant does not challenge the officer's order for the defendant to get out of the vehicle or deny that he refused and attempted to run away, which generated probable cause for his arrest. <u>Id.</u> According to the government, the only issue is whether the officers unlawfully prolonged the stop, which the government says is unsupported by law and fact. <u>Id.</u>

The government argues that an officer may ask questions—even if they extend the stop—if the officer's interaction provides reasonable suspicion of criminal conduct. <u>Id.</u> (citing <u>United States v. Martin</u>, 422 F.3d 597, 602 (7th Cir. 2005)). It asserts that Judge Joseph properly relied on Kotnik's testimony to find reasonable suspicion to ask about the marijuana, emphasizing that Judge Joseph found his testimony to be credible and corroborated. <u>Id.</u> at 9. The government argues that from years of experience, Kotnik knew what

25

marijuana smells like and that he testified that he smelled the odor in the vehicle. Id. The government argues that when the defendant denied smoking marijuana, Kotnik asked about the Ozium spray because, in his experience, people use that spray to mask the smell of marijuana. Id. at 9-10. The government points out that Kotnik also asked the officers searching the vehicle if they had found marijuana and that they said yes. Id. The government says that, given that Kotnik asked about the marijuana within minutes of approaching the car and mentioned the smell to others, it was reasonable for him to ask the defendant two questions about marijuana. Id. at 10.

As for the defendant's arguments that the "tear away" top on the mylar pouch had not been removed, the government says:

> This argument ignores the actual evidence—which indicated that this "tear away" portion had likely never been used. At the hearing, Kotnik stated that he's "only seen them as esthetic tear opens even though . . . they show the perforated edge" and that "[e]ven if that is still intact, it doesn't need to be torn open to be opened." (Tr. At 57:1-9.) In other words, although the mylar package might have been *capable* of being sealed, Kotnik has not seen this seal used. There is no evidence that this mylar pouch was sealed.

Id. (citing Dkt. No. 40 at 57). The government points out that Kotnik was not involved in the part of the search where the officers squeezed the pouch rather than opening it and suggests that the officers may have wanted to preserve the evidence. Id. at 11. The government also accuses the defendant of mischaracterizing Domine's report; it says that Domine never said he did not smell marijuana but rather accurately stated that the defendant was ordered out of the car because he lacked a valid driver's license. Id. The government says that the body-worn camera footage confirms that Domine's statement was

26

correct—Rutherford told the defendant to get out of the car because his license was no good. Id. In addition, the government says that Rutherford's report describes the smell of marijuana. Id. at 12. The government asserts that the smell of marijuana created probable cause, but it argues that the search of the vehicle was justified by the attempted flight. Id. The government dismisses the defendant's emphasis on the fact that Pettis testified that when the car was returned to her, she did not smell marijuana; it recounts that the officers did not return the vehicle to Pettis for some time and that they returned it only after they had removed the marijuana from the vehicle. Id.

The government argues that Kotnik's questions did not meaningfully prolong the stop because the entire encounter lasted less than four minutes from the investigation of the window tint until the defendant tried to flee. Id. at 13. The government points out that Kotnik asked the questions before he retrieved the tint meter, which shows that at the time he asked the questions, Kotnik still was assessing the situation. Id. at 14.

2. *Warrantless Search*

The government asks the court to reject the defendant's objections regarding Judge Joseph's conclusion that entry into the apartment did not violate the Fourth Amendment for two reasons: (1) the defendant told the officers that he did not live in the apartment and that he did not have a reasonable of expectation of privacy there; and (2) even if he had had a reasonable expectation of privacy, officers obtained the evidence from a written consent search. Id. at 15. The government disagrees with Judge Joseph's

27

conclusion that the defendant had standing to challenge the search of the apartment, emphasizing that the defendant told the officers he did not live there and he could not even state the address. Id. On this point, the government argues that Pettis—who testified that the defendant had lived in the apartment since 2019 and that he kept belongings there—had a clear bias because the defendant is the father of her two children and she testified that he pays for some living expenses. Id. at 17. The government contrasts Pettis's testimony with the fact that the defendant told officers he was homeless, that he told them he only sometimes stayed over with Pettis, that Pettis admitted that the defendant's name was not on the lease and that Pettis told officers that the defendant spent some—but not all—nights at the apartment in July 2023. Id. The government argues that, despite the defendant's argument that the court can review Judge Joseph's finding only for clear error because the government did not object to that finding, the court still can review this issue de novo because the bottom-line ruling from Judge Joseph was in the government's favor, so it did not need to "object to sub-issues to preserve them for review." Id. at 16 (citing United States v. Street, 917 F.3d 586, 599 (7th Cir. 2019)).

As for the consent, the government starts with the fact that the officers found the narcotics after Pettis signed a written consent to search the home. Id. at 18. The government points out that the defendant's objection does not include any argument about the written consent. Id. The government addresses the factors that courts consider when assessing the voluntary nature of the

28

consent. Id. at 19 (citing United States v. Kozinski, 16 F.3d 795, 810 (7th Cir. 1994)). It says that the body-worn camera footage establishes that Pettis was in her mid-20s and that there was no reason to question her intelligence; officers repeatedly advised Pettis of her rights; Pettis never was detained, placed in handcuffs or threatened with arrest; and officers told her the entire incident involved the defendant (who was in custody). Id. at 20. The government emphasizes that her initial refusal to consent shows that Pettis understood her right to refuse and that the officers' multiple requests for consent do not undermine the voluntary nature of her consent. Id. at 21.

Addressing the initial entry into the apartment, the government emphasizes that Pettis left the door exactly as open as it was when she used it and says that the only reasonable conclusion was that she was consenting to a conversation with the officers. Id. at 22. The government focuses on the fact that Pettis allowed the officers to enter and continue their conversation. Id. at 23. The government adds that Pettis's actions after the officers entered the apartment reaffirmed her consent. Id. at 24. The government points out that when she returned wearing the robe, Pettis did not express surprise that the officers were there, she did not ask them to leave and she never objected to their presence. Id. at 25-26. The government relies on the body-worn camera footage to suggest that the defendant has mischaracterized the interaction as one where Pettis was under duress. Id. at 26. The government also points out that when Pettis went to the bedroom to change, an officer asked to accompany her and to look in the back room for people "real fast." Id. Pettis said "sure" to

29

the officer. Id. The government emphasizes that the officers repeatedly reminded Pettis that a consent search could be terminated at her request. Id.

The government says that the officers had more than ten minutes of nonconfrontational interactions with Pettis during which they emphasized her right to refuse consent. Id. at 28. The government also cites Pettis's careful consideration of her options before she signed the form. Id. It asserts that the officers never breached the door, that they entered in the afternoon—not the dead of night, that they did not draw their weapons and that they never raised their voices. Id. at 28-29.

Finally, the government rejects the defendant's assertion that the bag of drugs was not within the scope of Pettis's consent. Id. at 29. The government recounts that the officers repeatedly told Pettis that they were searching for guns, gun boxes and gun forms. Id. at 30. The plastic bag containing the drugs was sitting on the gun box and was big enough to contain a firearm or firearm paperwork. Id.

C.    Defendant's Reply (Dkt. No. 58)

In his thirty-page reply brief,[1] the defendant clarifies that he always has challenged Kotnik's two lines of questioning: questions about the defendant's CCW status and questions about marijuana use. Dkt. No. 58 at 2. He admits that in his objections to Judge Joseph's report and recommendation, he didn't

_____

[1] Although the court's criminal local rules set no page limits for briefs, it is notable that the defendant's combined motions to suppress totaled thirty pages (Dkt. Nos. 22, 23) and his objection to Judge Joseph's report and recommendation was twenty-five pages (Dkt. No. 49).

30

focus on the CCW status inquiry but he says that is because the recommendation hinged almost entirely on whether Kotnik had smelled marijuana. Id. at 2. The defendant incorporates by reference his briefing from his underlying motion to suppress on the CCW issue, dkt. no. 33 at 2-3, and denies any waiver of that argument, but he concedes that the issue largely is moot if this court concludes the government met its burden of showing probable cause to believe that the defendant possessed marijuana, id. at 3.

The defendant reiterates the reasons he believes the court should doubt Kotnik's testimony, such as the small amount of marijuana, the fact that it was in packaging and the fact that Domine didn't mention the smell in his report. Id. The defendant asserts that these facts provide a sufficient basis to question Kotnik's claims that he smelled marijuana. Id. at 4. The defendant cites to 2018 and 2019 articles from the New York Times and a 2023 article in the William & Mary Law School Repository about officers' dishonesty and the practice of "testilying," arguing that these articles highlight a real concern because courts "often defer to the uncorroborated testimony of officers regarding things like the odor of marijuana." Id. at 4-5. The defendant suggests that the court should require the government to provide further corroboration by either calling additional officers to testify or by bringing in the mylar bag to court, which would show whether it was sealed. Id. at 5. The defendant drops a footnote opining that there would be no need for a further evidentiary hearing if the court agrees with the defendant, but stating that the defendant would not

oppose another evidentiary hearing on the issue of the odor of the marijuana. Id. at 5, 6, n. 3.

The defendant rejects the government's suggestion that there is any *de minimis* rule regarding the length of the stop. Id. at 6. He suggests that Kotnik stopped investigating the tint violation to pursue other, unrelated questions. Id. at 7. He points out that Kotnik hadn't tested the windows "when he veered off course." Id.

With respect to the portion of the recommendation addressing the officers' alleged unlawful entry of the apartment, the defendant argues that he clearly had a reasonable expectation of privacy in the Custer Avenue home. Id. at 8. He recounts that Pettis testified that the defendant lived there at the time, that he slept there most nights (the entire week before the arrest), that he kept belongings in the apartment, that he had his own set of keys, that he could enter without Pettis's permission or approval and that he had utilities in his name. Id. He says that during the search, officers found the defendant's W-2 form, an old driver's license and a Visa debit card. Id. at 9. The defendant accuses the government of mischaracterizing his "not knowing" his address and says that his statement to the officers is better understood as an expression of "hesitancy to admit his connection to the home because officers had just forcibly removed him from his car and tazed him moments before." Id. at 9.

The defendant maintains that the unlawful entry tainted Pettis's written consent. Id. at 11. The defendant says that the government has misstated

32

important facts because the body-worn camera footage shows that Pettis did not let officers into the common hallway or welcome them in in any way. Id. at 12. The defendant argues that Pettis "cautiously opened the outside the door of the building just lightly before Officer Domine walked over to the door and pulled it open entirely." Id. He says that Pettis remained inside the building while officers walked right past her through the door they had pulled open. Id. That said, the defendant concedes that he is not challenging the officers' entry into the common area of the building. Id. He says that he is challenging only the entry into the apartment. Id.

The defendant emphasizes that Pettis did not continue speaking as she entered the apartment to get dressed. Id. at 13. He cites the body-worn camera footage from Officer Katherine Stewart, which he says makes clear that it was Stewart—not Pettis—speaking and that Stewart said to Domine, "you cool if everyone comes in, Evan?" Id. The defendant emphasizes that Pettis left the door open wide enough only for her to "squeeze into her apartment." Id. The defendant contends that Pettis did not open the door and step to the side and that the first officer stopped at the threshold until the second officer decided to "goad" him into the apartment. Id. at 14.

The defendant argues that the government does not sufficiently grapple with the "extensive Fourth Amendment case law clearly establishing that consent cannot be inferred from mere acquiescence to the police's show of purported authority." Id. (citing Bumper v. North Carolina, 391 U.S. 543, 549 (1968)). He distinguishes the cases cited by the government on the ground that

33

in those cases, there were clear actions by which the defendant demonstrated consent to the initial entry into the defendant's home. Id. at 15 (citing United States v. Lewis, 608 F.3d 996, 999 (7th Cir. 2010); United States v. Wesela, 223 F.3d 656 (7th Cir. 2000); United States v. Price, 54 F.3d 342 (7th Cir. 1995)). The defendant argues that in this case, the officers didn't ask to come in—they walked right into the apartment when Pettis wasn't looking or present at the door. Id. According to the defendant, Pettis never was given the opportunity to object. Id. at 16.

The defendant argues that the factors used to determine whether the unlawful entry tainted the subsequent written consent weigh in favor of the defendant. Id. at 19. He asserts that the government relies on ten minutes of "nonconfrontation interactions" between the officers and Pettis, but says there is no case law holding that ten minutes is enough to dissipate taint. Id. at 19. The defendant also says that describing the consent as being separated from the unlawful entry by ten minutes is a "generous characterization." Id. at 20. The defendant argues that the consent happened while the initial intrusion still was in process and that there were no intervening circumstances that purged the taint of the initial entry. Id. The defendant suggests that if the officers truly were waiting to speak with Pettis and return the car keys to her, they could have waited at the doorway while she dressed. Id. at 23.

The defendant next argues that even if the initial entry was lawful, Pettis's consent was not voluntary because Pettis was "alone in her home with her toddler daughter, only partially clothed, and several months pregnant when

three male police officers entered her home without her explicit permission" and "the officers were visibly armed and wearing tactical vests." Id. at 24. The defendant says that the officers repeatedly sought Pettis's consent and that they began searching the home before she consented. Id. at 25. He asserts that the officers' threat to get a warrant was baseless because the officers did not have probable cause for a warrant—the defendant did not tell officers that he lived at the address, it wasn't listed on his driver's license and officers had no evidence that he had slept at the apartment that day or recently. Id. at 26. The defendant adds that Domine told Pettis that the defendant's possession of a firearm was "not a big deal" and "just a CCW violation obviously, that's a misdemeanor," when Domine *knew* that the firearm in the vehicle was equipped with an internal machine gun conversion device, which would not be a misdemeanor. Id. at 27.

Finally, the defendant argues that Judge Joseph erred in not considering his argument that the search exceeded the scope of any consent. Id. at 28. The defendant says that Malafa repeatedly reiterated that the investigation was a misdemeanor firearm investigation and that officers were interested in confirming that the defendant and Pettis had legally purchased their firearms. Id. at 29. The defendant points to statements about gun boxes and paperwork. Id. He says that Malafa suggested that the consent search would not be as intrusive as a warrant. Id. The defendant argues that the officers conducted a broader, exploratory search and that they opened the bag in the closet. Id. He maintains that this provides yet another basis to suppress the evidence. Id.

35

## VI. Analysis

### A.     Traffic Stop

The Fourth Amendment protects persons against unreasonable searches and seizures but the "ultimate touchstone . . . is reasonableness." United States v. Cole, 21 F.4th 421, 427 (7th Cir. 2021) (*en banc*) (quoting Lange v. California, 594 U.S. 295, 301 (2021)). A traffic stop is a seizure that may last no longer than what is necessary for officers to complete their "mission." Rodriguez, 575 U.S. at 354. As the parties agree, "[a]uthority for the seizure thus ends" when the mission is "or reasonably should have been" accomplished. Id. (citing United States v. Sharpe, 470 U.S. 675, 686 (1985)).

The Seventh Circuit has explained that a traffic stop involving a traffic violation may include checking the driver's license, registration, proof of insurance and whether there are warrants out for the driver's arrest. United States v. Devalois, 128 F.4th 894, 898 (7th Cir. 2025). It also can include questions about travel plans. Id. As long as the officers do not "prolong the traffic stop," they can ask questions that have nothing to do with the traffic violation or safety matters. Id. at 899.

Devalois—a Seventh Circuit case from 2025—is particularly instructive. In that case, the police stopped a vehicle for following too closely behind a semi-truck. Id. at 897. The driver couldn't locate the rental agreement so, consistent with police practice, the officer invited the driver to sit in the squad car while she searched for a digital copy on her phone. Id. The officer observed that the driver was trembling and nervous, and she told the officer that she

36

could not find the agreement. Id. Meanwhile, the officer walked back to the vehicle and asked the passenger (the defendant) for the vehicle's registration. The defendant, who was upset with the questions, began to use profanity. Id. He gave the officer the registration and the officer returned to the squad car and told the driver that he was only issuing a warning. Id. The driver remained anxious, so the officer asked whether there were drugs in the vehicle and whether he could search it. Id. The driver responded "no" to both questions. Id. When another officer arrived on the scene, the first officer handed him the citation to complete the warning, then took the narcotics canine to conduct a sniff outside the vehicle. Id. The defendant became irate, slid over to the driver's seat and sped off. Id. A pursuit followed. The defendant moved to suppress on the ground that the first officer unlawfully prolonged the stop to conduct the dog sniff. Id. at 898.

The Seventh Circuit affirmed the district court's ruling that the officer did not prolong the temporary seizure to conduct the dog sniff. Id. at 901. The court wrote:

> The record here firmly supports the district court's finding. While "we repeatedly have declined to adopt even a rule of thumb" as to how long a reasonable stop may last, [*United States v.*] *Gholston*, 1 F.4th [492,] at 496 [(7th Cir. 2021)], we note that about six minutes passed between Samuelson's first contact with the driver and Bosco's alert. *See id.* at 494–95 (concluding police did not unreasonably prolong a stop when a dog sniff occurred more than fourteen minutes after initial contact).
>
> During that time, Samuelson diligently pursued tasks that fell within the stop's mission. Indeed, many of his activities were directly related to the objective of the stop: issuing a warning for following too closely behind a semi-truck. *See* [*United States v.*] *Yang*, 39 F.4th [893,] at 902–03 [(7th Cir. 2022)]. At the outset, Samuelson sought

37

the driver's license. He then began a license status check and ran a search for the vehicle in the Illinois fleet system. When the driver could not produce the vehicle's rental agreement, Samuelson sought the registration card. Once he had the information he needed to write a warning, he began drawing one up. And although Devalois seems to suggest Samuelson's authority to continue the seizure ended then, he cannot be correct, as the officer still needed time to write the warning. *Rodriguez,* 575 U.S. at 354–55 . . . (describing the mission of a traffic stop as embracing the time needed to "*issu[e]* a warning ticket") (emphasis added). All these tasks related to the stop's mission. *Cole,* 21 F.4th at 428–29.

Throughout the stop, Samuelson asked several questions, none of which, the district court found, prolonged it. That finding was not clearly erroneous. To start, Samuelson was free to ask from where Devalois and the woman were traveling. "[T]ravel-plan questions ordinarily fall within the mission of a traffic stop," as they "supply important context for the violation at hand." *Id.* at 429. Reasonable follow-up questions are permissible, too. *Id.* at 431. Samuelson also asked the woman a series of questions to find out if there were drugs or other contraband in the car. To be sure, those questions were unrelated to the traffic stop. But they did "not convert the encounter into something other than a lawful seizure" because Samuelson was still actively preparing the warning ticket. *Arizona v. Johnson*, 555 U.S. 323, 333, . . . (2009). Moderate "question[ing] that do[es] not increase the length of the detention . . . do[es] not make the custody itself unreasonable." *United States v. Childs*, 277 F.3d 947, 949 (7th Cir. 2002) (*en banc*).

Id. at 899-900.

The Seventh Circuit emphasized that the second officer still was writing the ticket while the first officer conducted the dog sniff. Id. at 900. Put another way, the dog sniff did not prolong the stop because the second officer still was diligently pursuing the mission of the stop, and that remained true regardless of whether the officer had a reasonable suspicion that the vehicle contained drugs. Id.

In this case, the court is satisfied that the government has met its burden of proving by a preponderance of the evidence that reasonable suspicion supported the stop. The officers' actions are documented by the body-worn camera footage. There is no dispute that Kotnik had a basis for stopping the defendant (for excessive window tint). Kotnik's body-worn camera shows him approaching the defendant's vehicle, asking for the defendant's name and license, explaining that he was stopping the defendant for the window tint, asking the defendant if he knew what level of tint was on the windows and telling the defendant that Kotnik was one of the few officers in the department trained in window tint. Dkt. 39, Hrg. Ex. A at 00:54-1:34. After the defendant said that the vehicle belonged to his cousin, Kotnik asked for any documents with the VIN and the cousin's name on it. Id. at 1:34-1:58. Kotnik again asked the defendant if he knew what the legal limit was for the tint and the defendant searched for his insurance card for approximately forty seconds. Id. at 1:58-2:37.

Kotnik had reasonable suspicion to ask additional questions about the marijuana, as evidenced by Kotnik's hearing testimony, the contemporaneous statements made by Kotnik at the time of the stop and during the search and the statement made in Rutherford's report. As soon as the defendant showed him the insurance card, Kotnik asked whether the defendant had a CCW permit, when he last smoked weed in the car and why he had the Ozium spray in the car. Id. at 2:40-3:00. Kotnik testified that he could smell the marijuana

from the car and Rutherford included in his report that he also could smell the marijuana.

It also is significant that Kotnik returned to his car to grab the tint meter, which demonstrates that he still was investigating the tint violation. See id. at 3:04-4:05. While Kotnik retrieved the tint meter, Rutherford spoke with the defendant about the tinted windows. Dkt. No. 39, Hrg. Ex. B at 3:20-3:46. By the time Kotnik returned with the tint meter, another officer was asking the defendant to step out of the vehicle because the defendant's license was suspended. Dkt. No. 39, Hrg. Ex. A. at 4:06-4:18. At that point, the defendant put his foot on the accelerator and the officers moved quickly to remove him from the vehicle. Id. at 4:18-4:25.

In Devalois, the Seventh Circuit said that an officer may ask unrelated questions so long as the questions do not unnecessarily prolong the stop. Devalois, 128 F.4th at 898. Within seconds of the defendant producing his insurance card, Kotnik asked the defendant when he last smoked weed in the car because, as he testified, he could smell marijuana. The defendant objects to Judge Joseph's findings related to Kotnik's testimony, suggesting that Kotnik could not have smelled the marijuana in the mylar pouch in the center console. But the defendant's reliance on Bradshaw, 2025 WL 1445587, *6, is misplaced. In Bradshaw, Judge Griesbach granted a motion to suppress because he found no evidence from within the vehicle or argument by the government that would account for the smell of marijuana in the vehicle. In the absence of any such evidence, Judge Griesbach felt it would "be improper for the court to speculate

40

as to possible sources of the odor Officer Rukamp claims to have smelled." Id. Unlike the scenario in Bradshaw, in this case there was a possible source of the odor of fresh marijuana in the defendant's vehicle—the marijuana found in the console when the vehicle was searched.

The defendant suggests that, without more, Kotnik's bare claim that he could smell 3.8 grams of marijuana in a mylar bag in the console does not satisfy the government's burden. But as Judge Joseph pointed out when finding him credible, Kotnik's testimony was bolstered by the body-worn camera footage. Kotnik asked when the defendant had last smoked weed in the car, he asked why the defendant had Ozium spray and he asked the other officers whether they found weed in the vehicle. Although the defendant argues that there is no evidence that Kotnik has "real uniquely honed or specialized skill of olfaction," the government was not required to demonstrate such a skill in order to meet its burden. Kotnik testified that he had worked as an officer for nine years and currently was assigned to the Drug Enforcement Administration as a Task Force Officer. Dkt. No. 40 at 4. He had experience recognizing how marijuana smells and had conducted over a thousand traffic stops. Id. at 6-7. Kotnik testified that he could smell the odor of fresh marijuana, which prompted the question during the stop, and that he asked about the last time the defendant had smoked as a more "discreet way of inquiring about the marijuana in the vehicle." Id. at 9. Kotnik further testified that in his experience, people use the Ozium spray to mask the smell of marijuana. Id.at 10. Rutherford's report, which the defendant attached to his

motion, states that the defendant appeared nervous and frustrated while being questioned about the excessive tint and that during their conversation with the defendant, both Kotnik and Rutherford smelled the odor of fresh marijuana through the open windows of the vehicle. Dkt. No. 22-2 at 2.

The entire interaction—from the moment Kotnik approached the vehicle until the moment the defendant attempted to flee—took just a little more than three minutes. Although the resolution of this motion does not depend on the duration of the stop, the court is satisfied that officers did not unreasonably prolonged it and that the duration of the stop was justified by the excessive tint and the smell of marijuana. There is no reason to conduct a second evidentiary hearing when Judge Joseph found that the necessity of a first hearing was a close call, the government satisfied its burden and there are independent facts in the record to corroborate the officer's testimony. The defendant's attempt to flee at just past the three-minute mark gave the officers probable cause to search the vehicle where they found the marijuana. The court will adopt Judge Joseph's recommendation and deny the motion to suppress based on the traffic stop.

B.    <u>Unlawful Entry</u>

The defendant's second motion challenges the officer's entry into the apartment where Pettis resided with her toddler and their actions leading up to Pettis giving her written consent to search. This motion strikes at the core of the Fourth Amendment, which protects the right of an individual "to retreat into [her] own home and there be free from unreasonable government

42

intrusion." <u>Caniglia v. Strom</u>, 593 U.S. 194, 197−98 (2021) (citing <u>Florida v. Jardines</u>, 569 U.S. 1, 6 (2013)). Under the Fourth Amendment, a warrantless search of a home is presumptively unreasonable unless the government shows, by a preponderance of the evidence, that the search was reasonable under a valid exception to the warrant requirement. <u>United States v. Davis</u>, 44 F.4th 685, 688 (7th Cir. 2022) (citing <u>United States v. McGill</u>, 8 F.4th 617, 621 (7th Cir. 2021)).

### 1. *Defendant's Standing*

Before turning the merits, the court must address the defendant's standing to challenge the search. Fourth Amendment standing requires that the person challenging the search must have "a legitimate expectation of privacy" in the place that is searched. <u>Rakas v. Illinois</u>, 439 U.S. 128, 143 (1978). "A legitimate expectation of privacy exists when the defendant exhibits a subjective expectation of privacy [in the location searched] and the expectation is one that society is prepared to recognize as reasonable." <u>United States v. Pitts</u>, 322 F.3d 449, 456 (7th Cir. 2003).

The court agrees with Judge Joseph that the defendant has standing to challenge the entry. Although the defendant did not provide the officers with an apartment number for the Custer Avenue apartment and although the defendant told the officers that he was homeless, Pettis testified that he had been living at the apartment and that he kept belongings there. Pettis was the mother of the defendant's young child; at the time, she was eight months pregnant with their second daughter. She testified that the defendant lived at

43

the apartment "full time" and spent most of his nights there, except for the occasional Friday or Saturday when he would stay out late. She testified that he had his own set of keys, that his name was on the utility bill and that she and the defendant split the rent. Dkt. No. 40 at 70-75. Domine's report states that officers found a VISA debit card in the defendant's name in the apartment, as well as mail addressed to the defendant and five firearm dealer notification forms signed by the defendant. Dkt. Nos. 26-1 at 2, 26-4 (letters addressed to the defendant from the City of Cudahy Municipal Court, Department of the Treasury, and the Division of Motor Vehicles). A person has a legitimate expectation of privacy in a home in which the person is an overnight guest, Minnesota v. Olson, 495 U.S. 91, 96–97 (1990), and based on Pettis's testimony, the defendant was more than an overnight guest.

The government asserts that because she was the mother of the defendant's children and because the defendant possibly helped her financially, Pettis had an incentive to lie on the stand. But as stated above, officers found indicia of the defendant's occupancy during the search of the apartment. Nor is it clear to the court that Pettis would have reason to understand the doctrine of standing or why her testimony about where the defendant stayed would be relevant to that doctrine.

The defendant has standing to challenge the officers' entry into the apartment.

2.    *Initial Entry*

The next issue is whether Pettis consented to the officers' initial entry into her apartment. An "explicit verbal consent" or any other form of affirmative invitation to enter a dwelling is not necessary to constitute "consent" for purposes of the Fourth Amendment. United States v. Villegas, 388 F.3d 317, 324 (7th Cir. 2004) (citing United States v. Ramirez–Chilel, 289 F.3d 744, 752 (11th Cir. 2002)). "[C]onsent may be manifested in a non-verbal as well as verbal manner." United States v. Walls, 225 F.3d 858, 863 (7th Cir.2000); see United States v. Cotnam, 88 F.3d 487, 495 (7th Cir.1996) ("A person can, however, consent to the entry of their home or hotel by officers, and consent need be neither express or verbal.").

The defendant argues that Judge Joseph didn't sufficiently address the case law on implied consent and asserts that there needed to be something more than a partially opened door to allow her to find that Pettis consented. In United States v. Han, 105 F.4th 986 (7th Cir. 2024), the Seventh Circuit found that the defendant's wife implicitly consented to officers' initial warrantless entry of their home. The defendant's wife came to the door but did not open it when the officers knocked and rang the doorbell. Id. at 990. When an officer asked her to open the door, she did. Id. The officers stepped through the doorway and explained that her husband had been arrested and that they needed to confirm that there were not guns in the home. Id. The officer moved past the defendant's wife and said they wanted to make sure there were no guns. Id. Thirty minutes into the search, the officer asked the wife to sign a

45

written consent form and she complied. Id. The Seventh Circuit analyzed

whether the consent was voluntary, reasoning that

> [w]hile "answer[ing] a knock at the door" is not enough, *Hadley* [*v. Williams*], 368 F.3d [747, at 750 [7th Cir. 2004)], a person may impliedly consent by "opening a door and stepping back to allow entry," *United States v. Sabo*, 724 F.3d 891, 894 (7th Cir. 2013) (quoting *Harney v. City of Chicago*, 702 F.3d 916, 925 (7th Cir. 2012)); *see also Gerald M. v. Conneely*, 858 F.2d 378, 384–85 (7th Cir. 1988) (explaining that an officer could reasonably assume consent where the person answering the door said to "wait here," but did not "verbally object," "act astonished," or "physically respond in any way that" relayed disapproval when the officer entered anyway). Like in *Sabo* and *Conneely*, the record supports that Wang impliedly consented to the initial entry. Przybylo knocked, identified herself as police, and asked Wang to open the door. When Wang complied, Przybylo and Huertas stepped through the doorway, remaining by the door until Wang explicitly consented to the search. Importantly, Wang did not object to their entry or otherwise indicate that they should remain outside. Thus, we are not left with the firm and definite conviction that the district court erred when finding that the officers' intrusion into the threshold, without Wang's objection, did not contravene the Fourth Amendment.

Id. at 993. In addressing the voluntary nature of the consent, the Seventh

Circuit focused on the fact that the defendant's wife was forty years old and

had attended college in the United States. Id. at 991. She wasn't in custody or

detained. Id. Although she wasn't informed of her right to refuse, the officers

did not use or threaten physical force, they used conversational tone and the

wife effectively communicated even though her English was limited. Id. She

pushed back on their attempt to seize the car and wake her sleeping child. Id.

The court acknowledged that an officer falsely told her that her husband had

already consented, but based on the totality to the circumstances, the court

concluded that her consent was voluntary, citing her calm cooperation and conduct. Id. at 992.

In this case, the defendant has not challenged the officers' entry into the apartment building or their presence in the common hallway. Officers stood outside the building and called for Melissa. Dkt. No. 37, Hrg. Ex. D at 00:47-49. Pettis opened the door, and the officer waved as she entered the common hallway and opened the door to the outside. Id. Pettis, who was dressed in a long t-shirt, opened the door and peered outside, identified herself as Melissa in Unit 4, then said that she was going to put on a "robe or something" before opening her door and walking back inside. Id. at 00:49-1:05. The defendant did not "slide" back through the door; she pushed it partially open while the officers followed closely behind her. Id. There was no show of force, there were no raised voices, there were no threats and there was no suggestion that the officers were there to arrest Pettis. Like the defendant's wife in Han, Pettis did not close the door behind herself or object to the officers' entry into her apartment, and she appeared to calmly and voluntarily interact with the officers. This is not the situation described in Sparing, 266 F.3d at 684, where the defendant spoke to officers through a *closed* screen door. In this case, the officers passed through the door that Pettis left open.

Once inside the apartment, the officers stood in the entryway waiting for Pettis to return with her robe, which she did approximately twenty-five seconds later. Dkt. No. 37, Hrg. Ex. D at 1:05-1:30. Pettis turned on the lights, and an officer explained that the defendant had been arrested. Id. at 1:35. The officer

asked whether Pettis and the defendant had any firearms, and Pettis laughed with the officers as they complimented her aim (while looking at the targets on the wall). Id. at 1:51-2:37. After Pettis said that there were no guns in the house, she agreed to open the blinds to keep everyone safe. Id. at 2:27.

The defendant cites examples of Black women like Breonna Taylor, Sonya Massey, Shereese Francis, Trika Wilson and Yvette Smith—women who were killed in the sanctity of their homes—and suggests that a Black woman may never feel comfortable objecting to "blatantly unlawful instructions by the police." Dkt. No. 49 at 21. The tragedies the defendant recounts may well cause some, or many, Black women to feel that they are unable to object to law enforcement behavior, but the body-worn camera footage in this case gives no indication that Pettis felt such fear or intimidation. The court agrees with Judge Joseph that Pettis implicitly consented to the initial entry.

3.      *Voluntary Consent*

Next, the defendant objects that, given the allegedly coercive circumstances, any "purported" consent was involuntary. The government must prove by a preponderance of the evidence that Pettis's consent was voluntary. See United States v. Hernandez-Pineda, No. 25-CR-64, 2025 WL 2438683, at *5 (E.D. Wis. Aug. 25, 2025) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)). In determining whether consent justifies a warrantless search, the court considers whether the consenting individual had authority to consent to the searched spaces and whether the consent was voluntarily given, rather than the product of duress or coercion. Davis, 44

48

F.4th at 688 (citing United States v. Correa, 908 F.3d 208, 221–22 (7th Cir. 2018)). Whether consent is voluntary depends on facts such as: (1) the age, intelligence and education of the person who gave consent; (2) whether she was advised of her constitutional rights; (3) how long she was detained before giving consent; (4) whether she consented immediately or only after repeated requests by authorities; (5) whether physical coercion was used; and (6) whether she was in police custody at the time she gave consent. Correa, 908 F.3d at 222 (citing United States v. Cellitti, 387 F.3d 618, 622 (7th Cir. 2004)).

The body-worn camera footage shows that Pettis was a pregnant, young mother of a child. The court has no reason to question her intelligence. Officers repeatedly advised her of her constitutional rights and told her that she could refuse to let the officers search the apartment. At one point, she said, "I think I wanna wait, I don't know, for the search warrant," which shows that she understood that she could refuse. Dkt. No. 39, Hrg. Ex. D at 4:33-4:44. At all times, she communicated with the officers in a calm, conversational tone.

Officers advised Pettis of her rights. An officer presented her with options and reminded her that she had a right to wait while they applied for the warrant. Id. at 3:53-4:20. He told her that it was "totally up to you." Id. Pettis said, with some hesitation, "I'll think I'll wait," but she also directed her attention to each officer as the officer spoke and demonstrated a complete understanding that she had options. Id. at 4:33-4:44. The officers told her that she would be able to go outside, and she asked to put on pants (she still was wearing the t-shirt and robe). Id. at 5:05-5:18. The officers did a "walk through"

to make sure that no one else was present. Id. The female officer explained to Pettis what had happened to the defendant, and a male officer entered the room and again explained to Pettis her options. Id. at 6:15-10:44. The officer asked what Pettis's apprehension was with respect to the search and offered to explain the process in more detail. Id. He explained that there was a form and that she would be able to follow the officers. Id. Although the officer did say that a search via warrant would be intrusive and that officers would go through everything, he also emphasized that it was Pettis's constitutional right to refuse and that it was her decision. Id. The officer went through each line on the consent form. The officers' conversation with Pettis remained cordial and non-confrontational, and Pettis expressed her understanding. Pettis specifically asked whether the form was the first option; she thought about the two options, then she said that she would "go ahead and do this." Dkt. No. 39, Hrg. Ex. E at 2:23-2:50. There was no physical coercion, Pettis was never in police custody and officers never suggested that she was a suspect or target in any investigation. Pettis's consent was voluntary and not coerced.

### 4. *Scope of the Search*

Finally, the defendant objects to the search itself on the ground that, even if Pettis's consent was voluntary, the eventual search exceeded the scope of that consent. The body-worn camera footage captured the officers' repeated statements to Pettis about their desire to search for guns, gun boxes and any associated paperwork. Dkt. No. 39, Hrg. Ex. D at 9:15-9:19. Domine's report states that, in the hall closet, officers located a handgun box on the top shelf,

50

"located directly next to a white plastic grocery store bag containing a clear plastic zip lock bag with a large amount of multi-colored pills." Dkt. No. 26-1 at 2. The middle shelf contained two handgun boxes and sandwich bags, and another firearm box was located on the floor. Id. The photo of the hall closet shows the plastic bag sitting on top of the handgun box and confirms that the plastic bag was big enough to hold guns or associated paperwork. Dkt. No. 26-2. The officers did not exceed the scope of the consent.

The court will deny the motion to suppress.

### VII. Conclusion

The court **OVERRULES** the defendant's objections. Dkt. No. 49.

The court **ADOPTS** Judge Joseph's recommendation. Dkt. No. 46.

The court **DENIES** the defendant's motion to suppress based on unlawful entry and search. Dkt. No. 22.

The court **DENIES** the defendant's motion to suppress based on a prolonged traffic stop. Dkt. No. 23.

The court **ORDERS** that the parties must file a status report by the end of the day on **Friday, January 9, 2026**, advising the court of their anticipated next steps.

Dated in Milwaukee, Wisconsin this 11th day of December, 2025.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**

51